Okay, the next case is number 2011-12-39 in RE HYON. Mr. Newman, start. Thank you, Judge Newman. So, I'm going to attempt to take significant writings over time and distill them down in a way that's easy finally to digest and for the court to rule on. So, let's begin with recapture because for me that is a difficult subject from the perspective of how it's been written by this court, but easy for purposes of the fact pattern here. And the fact pattern here is quite significant because, as the court saw in our writings, the examiner restricted out the divisional claims that we discussed in our papers. And she says in that the following, restricted out because it sets forth different modes of operation and would be expected to produce different products. That is absolutely the core of why, for purposes of recapture, we succeed on that fact because there's nothing in Madam Solicitor's writings that can refute that. We saw in their papers they say the following, well, what happened is the following, that there was the application that's at issue here, there was a sister case, and the examiner took them up together. And somehow, by dint of that act, the examiner refutes, amends, withdraws, or does something magical to the restriction and, more importantly, to the words that are spoken in the record. There's no case law to support that, there's no evidence to support that, period. Number two, they discuss some concept about the change in scope. Well, that is also incorrect because if you take a look at the surrogate claims that we have, 40 and 84, as I recall them today, those claims began with the removal of pressure during the cooling stage. And the amendment that Madam Solicitor discusses is the following, and I'll use the surrogate claim again, claim 40 and one of its dependents, 43, the subject matter of 43 was brought up into 40. So there is no amendment that changes in a way the fundamental words that the examiner used. Full stop. This case is unique because this is a case in which the examiner sets out the stage for the defeat of the concept of impermissible recapture. And I've seen nothing in this papers, and there's no case law to support a different conclusion. And distilling all of this down, that's why we succeed on that subject. Let's move on now to obviousness. For obviousness, it's also a simple task. Why? Because you look at the crucible of one of ordinary skill in the art. And in doing that, let's start with Zacharides, because that reference alone gives us success. And in Zacharides, what's occurring? So we have a situation where the reference discusses the concept of using an open mold and moving material in direct molding to result in chain orientation. And then Madam Solicitor says, but also in that reference, there's a post-processing step where you cross-link. Cross-linking results in a firmer, stronger, more resistant compound. By definition, in Zacharides, you would not cross-link, or in this case irradiate, before you direct injection molding. Because if you do, then that material will not mold in the manner that's described in the Zacharides patent, and will not result in what the Zacharides patent tries to achieve. Clear teaching away. Zacharides says you cross-link at the end, and the Hume patent says you do something different. Zacharides alone takes care of it. But, let's look at Kitamura as well, for what that tells us. Kitamura, as the solicitor has somehow described, allows one to pick out a single feature, which in this case is irradiation pre-processing, and to somehow incorporate that into Zacharides, despite the fact that Zacharides teaches away. But when you look at Kitamura, and what's being achieved there, you have thin, not thick, you have the desire to have certain goals, which are dimensional stability, transparency, and increase in melt point. The complete opposite of the claims, surrogate claims, 40 and 84. So Kitamura, standing alone, is doing something different. In Madame Solicitor's brief, she actually says that all they did was to pick an element, irradiation out of Kitamura, and combine it with Zacharides, despite what I just articulated as the teaching around, despite the fact that Kitamura describes something completely different. And so all these papers and all these writings can be distilled down to those two facts. Recapture, as I articulated, and the lack of clear evidence for either side. The timing of when you cross-link affects the end product. Absolutely. So you do not get the ultra-hard plastic that you're trying to get if you cross-link before. For purposes of that articulation, if you're looking at Zacharides, you will not achieve the goal of Zacharides. And if you're looking at the claims of the Huon patent, where they describe this slight irradiation, that is for something different. And that does achieve a certain dimensional stability, resistance to wear, et cetera, at the end of the process. Completely different. Go ahead. Sure, go ahead. So you're saying that Kitamura is irrelevant? Yes. Is Kitamura irrelevant to what we're talking about here? No. And how is it relevant? It's not relevant. Not relevant. Okay, so you're saying it is irrelevant. Yes, I'm saying it is irrelevant for purposes of this obvious challenge as I articulated a moment ago. And that's it. That's the most simple, most dramatic way to distill it down. For recapture, it is fact-based. The examiner made certain statements on the record. They've never been withdrawn or refuted. They've been characterized in a way that isn't supported by the case law. And that's the end of it. And for obviousness, Zacharides has a clear teaching around. You can't cross-link at the beginning of the preprocessed step. Zacharides won't work. When you say it won't work, I'm not sure I understand. Sure, let's look at it. Let's look at it. Pull out the reference or please refer to it. Let's pick some figures for ease. I've asked the court to look at either, at the court's discretion, Fig. 4 set or Fig. 5 set. And I'll wait a moment. So, in both those sets, what the court is viewing is a direct mold of material. Ultra-high density, the one that we're dealing with here. In order to have it flow as characterized in these two particular figures, the material has to be able to move to the extremities here, which later I decapitated. If you cross-link, take a look at 4A or 4B, I'm sorry, 4A or 5A, if you cross-link what's Element 13 before you conduct the molding step, you will create a material that will not mold as reflected because by cross-linking, you're increasing the rigidity of that material. It is the antithesis of what was described in Zacharides as a very clear way to orient the strands in a way where you have homogeneity, but in the extremities, which you can see as shown in 4E and 5E, those are cut off, they're Elements 28 and 38. What results in Zacharides is a product that has nice oriented strands. Later, in a post-processing step, if you desire other characteristics, then you can put on the radiation. Completely different. And that's it. It's that simple. I have time reserved and I can, of course, remark on anything that Madam Solicitor has to say. Let's save your rebuttal time with an extra few seconds. Thank you, Your Honor. Ms. Nelson. May it please your Court. This Court can affirm the Board for two reasons. The Board found the claims to be unpatentable, both because they're obvious and because they are an improper recapture of surrendered subject matter. So this Court need only affirm one of the two rejections to dispose of the appeal. However, we submit that both of the rejections are proper and are fully supported by the record. First, with respect to obviousness, Hyen's position is incorrect. Zacharides and Kitamaro both deal broadly with manufacturing products out of ultra-high molecular weight polyethylene. And you see that by looking at the abstract, if you look at the field of the invention of both of them, and even if you look at the independent claims. They both are drawn broadly to working with ultra-high molecular weight. What I understood counsel was saying in response to my question was that Kitamaro, although it's in the same field, produces an outcome that's completely different than the outcome that his client's patent would produce or that Zacharides produces. And that's because of when you cross-link. That's what I understood him to say. So why is he wrong? Yes, that's what he has said. Although he has never submitted any kind of evidence to suggest or to show that that is actually true of Zacharides. And Zacharides, there's nothing in Zacharides that basically discourages one from following the path or any sort of direction. Going in diverges out. Either it is or it isn't. It's a scientific fact, and I certainly don't know what the answer is. That whether the timing of the cross-linking makes a difference  Well, the whole purpose of the cross-linking, and that's taught in Kitamaro, is to increase dimensional stability, to increase the melting temperature, improve transparency. Both of the references, I know he points you to particular figures and says that they wouldn't work. There's absolutely no indication in Zacharides that that would not work, even for those particular examples. Moreover, the Zacharides specification is not limited to those examples. Whether a reference doesn't talk about some chemistry, some science that's not done, to say whether it works or not, is not a factor, and whether it would have been obvious to make that change. Well, Zacharides clearly talks about cross-linking, and it does suggest that cross-linking at the end. But for all the very reasons that cross-linking is appropriate at the beginning, would, for the very same reasons, be applicable for Zacharides. There's absolutely nothing in Zacharides that would suggest that you couldn't cross-link. But how do you know that you can unless you look at what this applicant did? You can because Kitamaru, which is also talking about working with ultra-high molecular weight polyethylene, talks about if you cross-link at the beginning, and they do the very same process. I mean, Kitamaru is doing the same thing. It's basically heating the ultra-high molecular weight polyethylene. So it cross-links first, then it heats it to mold the product, and then at the end it cools it to get the final product. So it's doing basically the same thing, and it cross-links first, and that has no impact on its ability to then heat the product and stretch the product or compress the product into the final product. But you also seem to be saying you get a different product. It's still the ultra-high molecular weight polyethylene, but the quality is different because of when the cross-linking occurred. That's his argument. What does the record say about that? The record doesn't. Certainly there's nothing in Kitamaru that says that there's a reason for a cross-link, that you have to cross-link at the end, and there's nothing in Kitamaru to suggest that cross-linking at the beginning is any sort of a problem, creates any kind of a problem, in terms of then going forward with the other steps of the process, namely deformation. And this is the same issue that Judge Vogel has raised. Your opposing counsel was suggesting that you couldn't do the molding process of Zacharides if you had the cross-linking occurring prior. Well, that's exactly what Kitamaru is doing. Kitamaru is doing compression molding as well, and it's completely successfully. Now, Kitamaru heats, melts, after the cross-linking, right, and then molds at that point. Is that exactly the same molding as Zacharides, or does Zacharides do the molding process in a different way? Zacharides, the only difference is in the temperature range, but the temperature ranges overlap. Zacharides does it at a temperature range to get it to the point of softening, whereas Kitamaru talks, and so it says anything from somewhere in the range of 80 degrees below, from 80 degrees to the melting temperature, which is somewhere around 140 degrees. And Kitamaru talks about doing it between the melting temperature, so 140, and somewhat above the melting temperature. Would it be fair to say, in a kind of rough sense, that the Kitamaru strengthens the product at the beginning, and then has to melt in order to mold, whereas Zacharides doesn't do the cross-linking at the beginning, and therefore can mold without having to heat all the way to melt it, and then it strengthens afterwards? Well, there's certainly nothing in either of the two references that suggests that, and I think it's really just a matter of what kind of... I'm sort of interpolating, perhaps extrapolating really, from what you were saying, that the claimed ranges of the heating were overlapping nonetheless were different, and that it would suggest that the way the molding was done was at minimum typically done at a different temperature. Is that fair? Is that a fair inference to draw from these two references? Well, one is talking primarily about using softening temperatures, and I think it's just because of the exemplified products that it's making. But not because the substance after the early cross-linking is more difficult to work with. There's certainly no suggestion in Zacharides that there's anything about that you only use a softening temperature because... the reason you use a higher temperature is because you've crossed-linked before. There's certainly nothing in Kitamaro to suggest that. So both of the references are clearly dealing with ultra-high molecular weight. Both are talking about a variety of different products, and this is just a garden variety, obvious misrejection, where it's a predictable use of a prior art element for its well-established purpose, which is to give these particular improved properties, such as improved mechanical properties, transparency, higher melting temperature, and softening temperature. Any more questions? Weren't you going to move on to the... I was going to move on, but... I don't know any more about obviousness. Okay, proceed. Yes, with respect to ReCAPTCHER, Haim has made a big issue of this restriction, and it all basically stems from the Mostafazadeh decision and a line in the Mostafazadeh decision which was trying to reconcile a portion of our MPEP. On the facts, this case is clearly... falls squarely within the ReCAPTCHER doctrine, and I can explain what I think the Mostafazadeh decision says in a moment, but let me just say, if you look at page 31 of our red brief, it shows you all the various ways in which the claims have been broadened compared to the patent claims. There are multiple limitations that were in the patent claims that are now no longer present in this reissued claim.  In this brief, we go through the prosecution history and explain that each one of those limitations was added in attempt to overcome a prior art rejection during a prosecution of the patent. Therefore, it meets the first two steps of the ReCAPTCHER analysis. With respect to the other limitation which they're talking about, which has to do with this narrowing limitation, the melting temperature limitation, first, it's not even clear that it's narrowing with respect to one of the dependent patent claims, which actually overlaps with. But beyond that, this court has repeatedly said in Mostafazadeh, in North American Container, in PANU, and in Mentor, that the narrowing limitation must relate to the subject matter that was surrendered and then broadened on reissue. And there are three of those cases. The facts are essentially analogous to the facts here. In Mostafazadeh, there was the bus bar limitations, which the court held were not narrowing, were not materially narrowing because they were not related to the circular attachment pad, which was the broadening. In North American Container, the court held that the narrowing limitations were not related to the inner wall limitation, which was the broadening. And in PANU, the court held that the snag resistance means was in no way related to the shape of the haptics. So this case falls squarely within the recapture case law. Your opposing counsel relied, as you alluded to at the beginning of your discussion of this issue, heavily on the restriction requirement. And in responding to that in your red brief, that point you pointed us to the Geneva and Gerber cases at page 39 of your brief. Now, I read those cases and I didn't see them as addressing this issue. Is there something I missed in the reading of those cases or is there another point that you can make as to why it is that the restriction requirement does not entitle in to treat this as an entirely separate matter? Yeah, and I think there are several answers to that. First, with respect to those cases that were cited, it was really to point out that this court has held that there has to be consonance between the claims that were restricted and whatever claims. Okay, well that's a bit far removed from the precise question Right, but the precise question with respect to recapture and with respect to the extent there is any sort of relationship between our restriction requirements and the application of the recapture doctrine. In Mostafazda, this court was looking at a section of the MPP 14.12.02 and trying to make sense of how that fit in. And what the court said is that section of the MPP is really talking about situations that are outside where the recapture doctrine is not even triggered. And I think it's instructive to look at the example that's in the MPP there. Because the example there is a method of making glass lens which has an ion implementation step. And in the patent, there was a molten bath. All the claims were using a molten bath. And during prosecution, they added these temperature and pressure limitations. In reissue, the applicant came back in and claimed a different embodiment which had to use a plasma, instead of a molten bath, it had to use a plasma stream.  would be completely irrelevant to that surrender. It's totally irrelevant to the present claims that have been brought in on reissue. And in Mostafazda, that's basically what it said. It said that portion of the MP is really talking about situations where the reissued claims are wholly unrelated to the subject matter that was surrendered. And that is not a case that we have here. Here, the claims are central. The broadening limitations are central to what was surrendered. So I think we're completely different from what Mostafazda was talking about. And you said other than that language from Mostafazda, there's nothing else to support the notion that the restriction requirement changes the rules in this area? This court has never said anything to that effect. And I think there are a number of reasons. Certainly there are situations where a restriction could be evidence, relevant evidence, to whether or not it's a different embodiment. But this court has never said that the mere issuance of a restriction requirement puts you outside of the world of recapture, such that the examiner can no longer find that there has been recapture. I just want to add a couple more reasons why I think. One of the reasons we're explaining here is certainly on these facts, the examiner did demonstrate some ambivalence about the restriction requirement as evidenced by the fact that at first it was hit with 300 claims. The examiner issued the restriction divided into 12 groups. Later, when they filed the divisionals, the examiner recombined groups 2 and 5 and groups 6 and 12. And even in the examiner's answer, the examiner indicated that even though I made this earlier restriction requirement, these claims were closely related and the surrender that was made is still relevant to the claims here on reissue. But not if the surrender is obliged by a restriction requirement. The surrender wasn't obliged by the restriction requirement. Exactly. OK, that's my question. And one additional reason is that this court has held that the recapture doctrine is And in the world of prosecution and history of establishment, this court has always looked to surrenders made in continuations or other related applications in determining whether or not there has been a surrender. So that's an additional reason why it would not be a good rule, I think, to say that a restriction necessitates a finding that the case is outside of the recapture doctrine. Thanks, Judge Newman. So we're not suggesting the creation of a new good rule. We're not suggesting by dint of a restriction requirement that anything needs to be changed. What we're saying is that the words of the examiner that went along with the restriction requirement guide us in that alone. Set forth different modes of operation and would be expected to produce different products, period. Patentably distinct subject matter is not within the confines of the rule on recapture for this case. Different invention, different embodiment, period. End of story. All that I heard from Madam Solicitor embraces that concept. When she talks about Mastafazda, I hope I say that man's name correctly, she embraces the concept, and I'm not going to tell the court what it said in its own writings, but she embraces the concept that when you have a patentably distinct subject matter as articulated by the examiner, not George Moustakis, never surrendered, never abandoned, never changed, then the rule on recapture is inapplicable here. That takes care of that, as far as questions. As for, with all due respect to Madam Solicitor, the point she articulated on Zacharides, the crucible is one of ordinary skill in the art. Zacharides is clear in its teachings and why cross-linking occurs at the end. Khitomberu, which is irrelevant, is nonetheless to a different product seeking a melt point above molten state, not Zacharides below. And the end result is different. End of story. There is nothing that would compel, in this record or any other, one of ordinary skill in the art, to combine a single element of Khitomberu directly opposite to the teachings of Zacharides to result in what we claim is the invention. It's that simple. And that's my rebuttal. Thank you. Thank you. Thank you. Thank you, Mr. Sarkis. Thank you. In case you've taken any submissions.